No. 83-202

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

GREG C. JOHNSON,

Plaintiff and Respondent,

-vs-

SUPERSAVE MARKETS, INC.,
a Montana Corp.,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Garlington, Lohn & Robinson; Paul C. Meismer argued,
and Gary L. Graham argued, Missoula, Montana

For Respondent:

Ellingson, Lovitt & Moe; Nancy K. Moe argued, Missoula,
Montana

---

Submitted: June 5, 1984

Decided: August 13, 1934

Filed: AUG 13 1984

*Ethel M. Harrison*
—————————————————
Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Super Save appeals from a judgment entered on February 9, 1983 by the District Court of the Fourth Judicial District awarding Johnson $17,000 in damages.

Respondent filed an action on December 14, 1981 seeking damages for intentional unlawful arrest or imprisonment or, in the alternative, for money damages resulting from appellant's negligence in causing an arrest and imprisonment.

A jury trial was commenced on all issues on January 24, 1983. At the close of respondent's case-in-chief, the trial court granted appellant's motion dismissing the count for intentional tort and the prayer for punitive damages. On the negligence issue the jury decided liability in respondent's favor and awarded $17,000 in damages, subject to a fifteen percent reduction for comparative negligence.

Appellant filed timely consolidated post-trial motions: motion for judgment notwithstanding the verdict, motion for entry of an amended judgment, motion for a new trial. Appellant's motions were denied. This appeal followed.

Respondent cross-appealed. The cross-appeal requests the jury verdict and judgment of the district court judge be affirmed, the directed verdict on punitive damages be overruled and the case remanded on the issue of punitive damages only.

On January 2, 1979 respondent's wife, Rosemary Johnson, issued a check on respondent's account made payable to Super Save in the amount of $35.99. Rosemary Johnson signed the respondent's name without his knowledge. Using Rosemary's driver's license number as identification, Super Save's employee cashed the check. Upon presentment, the draft was

2

returned to Super Save for insufficient funds. This check is the basis of the complaint filed against appellant.

Respondent had no established check-cashing policy with Super Save granting Rosemary permission to sign his signature for check cashing purposes. Respondent testified that on previous occasions his wife had signed his signature on his account but only in his presence. Occasionally respondent issued and signed a check in blank for Rosemary to cash at local businesses. Respondent testified that on January 2, 1979 he did not authorize his wife to sign his signature on any draft from his checking account.

In January, 1979 Marcia Gaustad, the Super Save employee charged with collection of bad checks, sent two demand letters to respondent requesting that he honor the subject check. Respondent's mother assured Ms. Gaustad that payment would be made before February 10, 1979. Respondent did not make restitution in February or March.

Upon respondent's failure to make the check good, Super Save sent the account to a collection agency, Data Check. Data Check wrote at least one demand letter to respondent by certified mail which was accepted by respondent's wife. No payment resulted through these collection efforts.

Between March 8 and 29, 1979, Data Check assigned respondent's delinquent account to the Missoula County Attorney's office for prosecution. The County Attorney attempted to contact respondent on March 29, without success.

On April 3, 1979 respondent made restitution on the delinquent draft directly to Super Save. He received a receipt for full payment. After restitution was made, Super Save's standard business procedure was to apprise the collection agency (Data Check) of such final payment. Once Super Save transferred the bad check to Data Check for

3

collection, the established policy was for Super Save to deal directly with its agent, Data Check, and not the County Attorney's office.

Prior to filing a criminal complaint against respondent, the County Attorney's office attempted to verify restitution by contacting both Data Check and Super Save. The Super Save employee was unable to confirm restitution by respondent. Data Check "absolutely verified that there was no restitution" on respondent's delinquent account. On June 7, 1979, the County Attorney filed a complaint and obtained a warrant for respondent's arrest.

On December 16, 1979, respondent was driving his automobile. He was stopped for suspicion of driving under the influence of alcohol and arrested when a routine check disclosed the outstanding warrant. The arresting officer instructed him to drive to the city jail where he was handcuffed, frisked, booked and fingerprinted. Two and one-half hours expired from the time respondent was arrested to the time he was able to post bond and be released. Charges against respondent were dismissed on December 18, 1979, based on restitution he made six months prior to his arrest. Appellant presents the following issues upon appeal:

1. Whether the jury verdict finding that respondent was unlawfully arrested is supported by the evidence.

2. Whether Montana recognizes a right of action for negligence resulting in imprisonment.

3. Whether emotional distress damages are proper in a negligence action absent a finding of injury.

4. Whether the jury award of damages is cumulative.

The determinative issue is not unlawful arrest but negligence. Negligence was properly pled in the respondent's complaint and adequate jury instructions were given to

4

properly submit the issue of negligence. The only necessary determination is whether the record supports a finding of negligence.

Appellant owes its patrons the duty to exercise reasonable care to avoid arrest and criminal charges for nonpayment of a bad check for which restitution has been made. The appellant could be found to be negligent for breach of this duty on two counts: (1) cashing the subject check without proper identification; and (2) failing to terminate the collection process once respondent made full payment on the delinquent draft.

Mr. Edward M. Pope, corporate secretary-treasurer and chief financial officer, testified about Super Save's check-cashing policies. Honoring a check made out to Super Save which is written by someone other than the person presenting the check for payment required either two forms of identification or an established check-cashing policy with the individual party. Cashing the check using her husband's name, absent an agreement permitting Rosemary to sign, violated Super Save's check-cashing policies and constituted evidence of negligence.

Super Save's failure to curtail the collection actions brought against respondent once he made full payment on the outstanding check evidences the second act of negligence. It is undisputed that Data Check was acting as Super Save's agent. It was incumbent upon Super Save to insure all collection actions initiated by Data Check, including assistance from the County Attorney, were discontinued upon restitution made by respondent. Respondent's arrest six months post restitution resulted from Super Save's failure to fulfill this obligation.

5

We now address appellant's contention that damages for emotional distress may not be recovered absent a finding of injury. In Versland v. Caron Transport, (Mont. 1983), 671 P.2d 583, 40 St.Rep. 1681, 1686-87, this Court unequivocably eliminated the physical injury requirement for recovery of emotional distress resulting from negligent infliction.

> "While physical manifestation of emotional trauma may be considered by the trier of fact along with other evidence, physical manifestations will not be required to support a _prima facie case for negligent infliction of emotional distress_." (emphasis added)

While Versland is apposite, it is distinguishable from the instant case. In Versland there was contemporaneous observance resulting in shock to the senses.

This Court is aware that recovery for emotional distress is vulnerable to counterfeit claims. We are correspondingly reluctant to permit damages for specious emotional upset.

The Supreme Court of Kansas defined "emotional distress" as follows:

> "Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises." Roberts v. Saylor (1981), 230 Kan. 289, 637 P.2d 1175, 1180.

Determination of compensable versus non-compensable "emotional distress" is inherently problematic and replete with contradictory legal authority.

> "Whether legal protection should extend to the interest in emotional tranquility has been a subject of controversy not only in California, but elsewhere: 'No general agreement has yet been reached as to the liability for negligence resulting in fright, shock, or other 'mental suffering', or its physical consequences." Molien v. Kaiser Foundation Hospitals (1980), 167 Cal.Rep. 831, 616 P.2d 813, 817.

6

We recognize that there is a difference between injury and distress. If plaintiff demonstrates either a psychic or physical injury causally related to the incident in question there is compensability. Here we have no testimony supporting injury. We must decide whether to allow compensation for mental distress absent injury and, if so, under what circumstances. We allow recovery for mental distress damages resulting from shock caused by contemporaneous observance. Versland, supra. We allow recovery for grief in a wrongful death setting. Dawson v. Hill & Hill Truck Lines (Mont. 1983), 671 P.2d 589, 40 St.Rep. 1689. Courts generally allow damages for embarrassment, humiliation and other mental distress, absent injury, where defendant's conduct is intentional or outrageous. To deny recovery in this case would focus upon defendant's culpability which is more properly considered when addressing the subject of punitive damages.

This Court supports the rationale of the Oregon Court of Appeals in Meyer v. 4-D Insulation Co., Inc., (1982), 60 Or.App. 70, 652 P.2d 852, 854:

> "Damages for emotional distress are compensatory, not punitive. Thus, the quality of the conduct is per se irrelevant, because negligently caused damage may be as disturbing as that caused by a defendant intentionally. . . . the relevance of the quality of the conduct is in its effect on the victim."

Therefore, whether tortfeasor's conduct is "extreme and outrageous" is not controlling and fails to provide a useful measure by which to evaluate compensable "emotional distress". We agree with the Oregon court's conclusion:

> "We do not yet live, however, in an 'eggshell society' in which every harm to property interests gives rise to a right of action for mental distress. . . . 'A certain amount of emotional distress and anxiety is an unavoidable part of living in our complex society'. . . . Some emotional upset is still left uncompensated.

7

> Extension of the right to recover damages for mental distress in a given case is basically a policy decision. The Supreme Court's extension of that right by species of case is consonant with the reluctance of courts in general to give credence to mental distress claims absent some indication that they are real and not feigned." Meyer, 652 P.2d at 857.

This Court adopts the species of case approach which requires a factual analysis of each case to determine whether the alleged "emotional distress" merits compensation. In determining whether the distress is compensable absent a showing of physical or mental injury, we will look to whether tortious conduct results in a substantial invasion of a legally protected interest and causes a significant impact upon the person of plaintiff.

Applying these principles to the case before this Court, we conclude that respondent's right to liberty was violated when he was arrested, handcuffed, frisked, booked and charged for issuing a bad check, for which he made complete restitution six months earlier. Respondent's right to liberty is legally protected from such invasion and his humiliation, embarrassment and other "emotional distress" proximately caused by such intrusion can certainly be considered substantial.

Unable to pay the $500 bond placed upon his release from the county jail, appellant summoned his divorce attorney for help and advice. His attorney testified to the devastating emotional impact the episode of being arrested and jailed had upon his client. He described appellant's condition as he found him in jail:

> "A. Mr. Johnson was much more agitated than what I had seen him before in the course of my office consultations and other meetings that I'd had with him. He appeared to me to be about on the verge of tears. He seemed disoriented. Not in the sense that psychologists or psychiatrists would use that term but rather in a sense that he didn't understand why he was there, what had happened that

8

had led him to be there. He didn't understand the goings on that were really going on around here. He kept asking me: 'Why was I arrested? Am I going to go to prison? What's going to happen to me?' I would explain the things as I understood them at that time from what little information I had, and the same question would come up again.

"I had found in my conversations with Mr. Johnson even in the stress of the divorce action that he could understand what I was saying to him and could frame intelligent responses and intelligent questions. But in this circumstance, it was sort of like a record hitting a crack and jumping back. Get the same question, same question; answer it, answer it; same questions. That was uncharacteristic about him. I noticed that he seemed to be much more animated than he normally would have been. A lot more hand movement, expressions, pacing, and nervousness was very apparent to me."

This evidence shows a significant impact upon the plaintiff. Therefore an award of damages is, under these facts, sustainable.

Appellant's final issue alleges that the jury award of damages is "cumulative" resulting in an "excessive" verdict.

The facts relating to this issue are unique. The cause of action was submitted to the jury on a special verdict form. The jurors answered the questions and granted a blanket amount of $17,000 in damages. In an extra display of diligence, the jurors voluntarily added a handwritten list enumerating five separate elements of damages accounting for the total $17,000 figure. On the face of the verdict appears the following itemized hand-written list: damage to reputation $3,000; social stigma $5,000; shame and embarrassment $2,000; mental anguish $2,000; and damages to self image $5,000.

Appellant contends that cumulative damage awards are not permitted to stand independently. Additionally, appellant argues that the award for damage of reputation and social stigma are not supported by the evidence and therefore must fail. Appellant states that the only damage item properly

9

awardable would be damage for mental anguish in the amount of $2,000.

It is undisputed that the record is void of evidence supporting damages to respondent's reputation or social stigma. Testimony reveals that respondent's arrest was never published in the Missoulian and the appellant did nothing to publicly disseminate any harm to respondent's reputation, such as distribute a list of bad check offenders containing respondent's name. However, absent the volunteer statement, we would not know damage to reputation and social stigma were considered as part of the basis for the $17,000. Without the handwritten list by the jurors, the verdict could not be successfully challenged.

This Court is reluctant to impeach the validity of the verdict by jurors' testimony and affidavits. In State Bank of Townsend v. Maryann's, Inc., (Mont. 1983), 664 P.2d 295, 40 St.Rep. 637, this Court upheld the District Court's refusal to consider jurors' affidavits explaining the damage award, when considering a motion to reduce the damage figure as excessive. Citing Harry v. Elderkin (Mont. 1981), 637 P.2d 809, we concluded:

> "We hold in this case that it would be improper to consider the juror affidavits to delve into the thought processes of the jurors in connection with the completion of the special interrogatories." State Bank of Townsend 664 P.2d at 229.

Applying this legal principle to the present facts, we are not compelled to impeach a verdict with considerations of the jury which are voluntarily offered just as we uniformly refused to do so when the same information is elicited under oath through affidavits.

This Court approves of the rationale stated by the Intermediate Court of Appeals of Hawaii in Vieau v. City and County of Honolulu, (Hawaii, 1982), 653 P.2d 1161, 1166.

10

Where a special verdict form contained the instruction that the jury was to answer questions only under certain conditions and the trial court adequately instructed the jury on matters concerning the special verdict form, but the jury failed to follow such instructions and answered the questions, the Hawaiian court concluded:

> "Under the circumstances, the trial court could have treated the answer to Question 5 as surplusage and ignored it."

Perhaps the jury's verdict when integrated with the handwritten list of elements of damages appears "cumulative"; however, there is no question that the jury awarded the sum of $17,000 in damages to compensate respondent for his "emotional distress". That they compartmentalized this total figure into elements of damages may not be utilized to contradict their initial determination. Using Vieau as precedent, we shall treat the hand written list as surplusage and accept the verdict as valid.

Respondent's cross-appeal challenging the directed verdict on punitive damages is denied. Conduct sufficient to support punitive damages in this case would have to meet the standard of implied malice set forth in Owens v. Parker Drilling (Mont. 1984), 676 P.2d 162, 41 St.Rep. 66. The trial court did not feel there was sufficient evidence of reckless conduct to create a submissible issue for the jury. We agree.

Affirmed.

Justice

11

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices


Mr. Justice John C. Sheehy will file a written opinion later.

12

Mr. Justice L.C. Gulbrandson concurring in part and dissenting in part.

I concur with the majority opinion denying the respondent's cross-appeal, but I respectfully dissent from the affirmance of the judgment.

This case actually involves three checks drawn on the respondent's account and payable to the appellant, although the County Attorney's office chose to file a criminal complaint on only one of said checks. That check had been returned to appellant by the bank and was marked "account closed." The transcript reveals that the respondent had in fact issued "NSF" checks on the same account during 1978 and that he was aware that his wife consistently signed his name to checks drawn on his account. The respondent conceded that the appellant could not have known that the signature on the check was not his, and even the bank failed to discover that the signature was forged.

In my view, there was probable cause to believe that the respondent had committed the offense at the time collection procedures were initiated, and, in fact, previous counsel for respondent conceded that fact. I would therefore hold that there was no evidence to support the jurors' answer of "Yes" to the special verdict question No. 1, "Was the arrest of the Plaintiff and subsequent confinement in the holding cell unlawful or wrongful?"

The majority finds that two and one half hours expired from the time of arrest until respondent was released, even though it was agreed in the pre-trial order that the appellant was booked in at 6:20 a.m. and released at 7:15 a.m. I realize that this is an insignificant fact inasmuch as, under the majority rationale in extending recovery for emotional distress, a five minute detention would be

sufficient for affirmance.

I disagree further with the majority's finding that the cashing of the check in question violated Super-Save's check cashing policies. The jury did not specifically make that finding, and the appellant's witness, Pope, in the defendant's case-in-chief, testified that the cashing of the check in question would not violate the appellant's check-cashing policy.

The majority states: "It was incumbent upon Super Save to insure all collection actions initiated by Data Check, including assistance from the County Attorney, were discontinued upon restitution made by respondent." To the extent that that statement can be interpreted as requiring a merchant to insure that criminal actions be discontinued after restitution, I disagree.

Question No. 6, of the special verdict reads as follows: "Question no. 6: What is the total amount of compensatory damages the Plaintiff suffered. List specific items of damage and total the damages."

And the jurors answered:

| "Damage to reputation | $3,000 |
| Social stigma | $5,000 |
| Shame and embarassment [sic] | $2,000 |
| Mental anguish | $2,000 |
| damage to self image | $5,000 |
| | $17,000 |

plus Defendant will pay all attorney fees
and court costs."

Where the jurors' answers clearly indicate that they considered elements of damages outside the evidence and the instructions of the court, I would reverse and remand for a new trial.

_____
Justice

-14-