No. 87-70

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

JOHN GURNSEY and QUENTIN MANG,

Plaintiffs and Respondents,

-vs-

CONKLIN COMPANY, INC., CLYDE IVERSON,
and ROBERT PLACE,

Defendants and Appellants.

---

APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Ugrin, Alexander, Zadick & Slovak; Gary M. Zadick
argued and John Alexander argued, Great Falls, Montana

For Respondent:

Erik B. Thueson argued, Helena, Montana
Dennis P. Connor, Great Falls, Montana

---

Submitted:   November 5, 1987

Decided:   January 6, 1988

Filed:   JAN - 6 1988

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

The plaintiffs brought this multi-count action to recover damages for a partial crop loss. The action was tried by jury in the District Court for the Eighth Judicial District, Cascade County. Plaintiffs obtained a judgment including $132,500 in compensatory damages and $1,000,200 in punitive damages. We reverse and remand for retrial.

Defendant Conklin Company, Inc. (Conklin) has raised thirteen issues on appeal. We restate them as follows:

1. Did the District Court err by not granting a mistrial as a result of the prejudicial testimony of John Gurnsey concerning the death of his wife?

2. Did the District Court err by allowing the introduction of evidence concerning insurance?

3. Did the District Court err by allowing the introduction of testimony and exhibits concerning post-transaction activity in violation of the order granting severance?

4. Did the District Court err in allowing testimony which contained hearsay statements attributed to non-party independent distributors?

5. Did the District Court err by giving a special verdict form which 1) omitted the requirement that the jury find "legal cause"; 2) did not require the jury to make a finding of gross negligence, recklessness, or malice as a prerequisite to an award of punitive damages; 3) did not allow separate consideration of the theories of actual fraud and constructive fraud and failed to instruct the jury properly as to constructive fraud?

6. Did the District Court err by not allowing the jury to compare like conduct?

7. Did the District Court err in its instructions on emotional distress?

8. Did the District Court err in its instructions on liability for the negligent selection of an independent contractor?

9. Did the plaintiffs fail in their burden of proof of punitive damages, and was the punitive damage award the result of passion, prejudice, or other error?

10. Did the District Court err by excluding evidence offered by Conklin?

The plaintiffs are Montana grain farmers. Quentin Mang is John Gurnsey's father-in-law. At the time this action arose, the plaintiffs both farmed small tracts west of Great Falls, Montana.

The plaintiffs brought a five-count complaint against defendants for partial failure of their 1983 wheat and barley crops. Plaintiffs' complaint states that defendants Clyde Iverson and Robert Place, acting as agents for defendant Conklin, sold them liquid fertilizer (FEAST), misrepresenting it as a "complete" fertilizer which would greatly increase crop yields. The complaint alleges that the plaintiffs were unlawfully induced to join the FEAST distribution scheme and were wrongly instructed on how to use and apply FEAST. Plaintiffs claim they suffered crop loss and other monetary damages as the result of defendants' breach of contract of sale, breach of implied warranties of fitness and merchant-ability, and breach of express warranties. Counts two and three of the complaint allege that in selling FEAST, the distributors made fraudulent and negligent misrepresenta-tions. Count four alleges that defendants violated their duty of good faith and fair dealing, and count five alleges that defendants negligently instructed plaintiffs how to use and apply FEAST.

The court severed the bad faith claim from the other claims. At the two-and-one-half week jury trial on the

3

remaining claims, the parties presented conflicting evidence on the contested facts. The defense was based on plaintiffs' failure to read or follow written and laboratory instructions on use of the fertilizer. Also, Conklin's position is that its distributors are independent contractors, so that it is not liable for their wrongs. The jury returned a verdict in favor of plaintiffs. They found Quentin Mang 38% negligent and awarded him compensatory damages of $82,500 and punitive damages of $500,100. They found John Gurnsey 30% negligent and awarded him compensatory damages of $50,000 and punitive damages of $500,100.

## I

Did the District Court err by not granting a mistrial as a result of the prejudicial testimony of John Gurnsey concerning the death of his wife?

John Gurnsey's wife died during preparation of this matter for trial. There is no claim that her death was caused in any way by the defendants.

The offending testimony came while plaintiff John Gurnsey was on the stand. He had testified that he was 49 years of age and had daughters ages 7 and 10. He had then testified at length about the events of 1982-83 during his purchase and use of FEAST. His attorney then asked:

Q   When you lose a year's crop, does it just affect you, John?

A   It affected me, yes.

Q   Does it affect the people that rely on you?

A   It certainly has. I lost my wife.

The defense objected on the basis of relevance and prejudice and the court admonished the jury to disregard the statement. Apparently to allow Mr. Gurnsey time to compose himself, the

4

court then recessed early for lunch. Conklin's motion for a mistrial, made in chambers, was denied.

Conklin argues that this episode was highly prejudicial and that, considering the amount of punitive damages awarded, its prejudicial effect cannot be ruled out. We agree. Although the trial court has a great deal of discretion in ruling on a motion for mistrial, it may be reversed if there is a showing of abuse of discretion. Morehouse v. Ylvisaker (1968), 152 Mont. 57, 446 P.2d 432. The emotionally-charged nature of this exchange can be sensed even in the transcript. We hold that the District Court erred in failing to grant a mistrial.

## II

Did the District Court err by allowing the introduction of evidence concerning insurance?

As part of count one, plaintiffs' complaint alleged that defendants misrepresented that they carried "hundreds of thousands of dollars in insurance" which would protect plaintiffs from losses if FEAST did not perform as represented. Defendant Conklin moved to strike the reference to insurance prior to trial, but the court ruled that the issue of insurance was relevant to the material issue of defendants' misrepresentations to plaintiffs. At the time of that ruling, the claim that Conklin breached its contract was still alive. Quentin Mang testified at trial that Clyde Iverson made the statement about insurance during their first meeting in order to induce him to purchase FEAST.

While jury instructions were being settled, plaintiffs' counsel informed the court they would no longer proceed under the breach of contract theory. Conklin argues that this was a calculated course embarked upon by plaintiffs to wrongfully get into evidence the statement that Conklin was insured. Conklin points out there has been no allegation that the

5

statement was untrue and contends that the statement is not admissible. Plaintiffs argue that the statement was part of a fraudulent scheme to get them to buy FEAST, and is therefore relevant.

Rule 403, M.R.Evid. provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Evidence of a party's insured status is generally inadmissible in Montana tort actions because of the prejudicial potential of such evidence. See, e.g., Avery v. City of Anaconda (1967), 149 Mont. 495, 428 P.2d 465. While insurance coverage for participants in business transactions is increasingly common, the prejudicial potential of the mention of insurance is still present.

After reviewing the record, we conclude that the statement with regard to insurance was a minor part, at most, of the claim of fraud or misrepresentation. Only one statement was alleged, and that was made during the initial sales talk. We hold that the danger of unfair prejudice substantially outweighed the probative value of the statement of insurance under Rule 403, M.R.Evid. We direct that such evidence shall be excluded on retrial.

### III

Did the District Court err by allowing the introduction of testimony and exhibits concerning post-transaction activity in violation of the order granting severance?

Conklin alleges that the court erred by allowing into evidence various letters written by the plaintiffs subsequent in time to the crop loss. Conklin argues these letters have

6

no place in the present trial and are admissible only in the bad faith cause of action. As previously mentioned, prior to trial the court severed the bad faith claim for separate trial. The plaintiffs contend the letters were admissible as evidence of the "pain, frustration, and anger" suffered by Mr. Gurnsey and Mr. Mang. They also contend the letters address the punitive damages prerequisites of maliciousness, recklessness, and conscious effort to commit a fraud.

After carefully reviewing the transcript, we conclude that the letters written subsequent to the loss of crops, including those written shortly prior to trial, should not be admitted as evidence in this action. They do not directly relate to the fraud theory or negligence theory. They do not support the claim for emotional distress except in an indirect manner. The use of the letters as evidence should be postponed to the trial of the bad faith claim. On retrial the letters should not be admitted as evidence.

IV

Issue IV Deleted
See Order Dated 3/31/88
in Court File

Did the District Court err in allowing testimony which contained hearsay statements attributed to non-party independent distributors?

Before the trial commenced Conklin sought to restrict the use of the depositions of certain farmers residing in Oklahoma. Those depositions contained statements allegedly constituting misrepresentation by independent distributors of FEAST in Oklahoma. Portions of the depositions of the Oklahoma farmers were read to the jury, including statements attributed to these independent distributors that FEAST could be used as a full program without the need of a supplement. Plaintiffs contend that the statements are not hearsay because they were not offered for the truth of the statements, but as evidence of Conklin's fraudulent marketing scheme.

7

The independent distributors referred to in the depositions were subject to the same type of a contract as were the defendants Iverson and Place. These contracts provided that they were independent contractors. No evidence was submitted with regard to the character of the relationship between these distributors and Conklin.

The commission comment under Rule 801, M.R.Evid., makes the following statement with regard to proof of an agency relationship:

> It should first be pointed out that the statute plainly requires a foundation to be laid showing the existence of a partnership or agency before an agent's admissions will be allowed in evidence. . . under (D) the terminology "agent or servant" and "scope of agency or employment" indicates that this must be shown before this type of statement would be admitted.

In the absence of some proof of an agency relationship, the statements attributed to the non-party independent distributors constitute hearsay. We hold that it was error to admit this deposition testimony.

V

Did the District Court err by giving a special verdict form which 1) omitted the requirement that the jury find "legal cause"; 2) did not require the jury to make a finding of gross negligence, recklessness, or malice as a prerequisite to an award of punitive damages; 3) did not allow separate consideration of the theories of actual fraud and constructive fraud and failed to instruct the jury properly as to constructive fraud?

Conklin argues that any one of these errors, standing alone, constitutes reversible error. The special verdict form was six pages long. Issue one asked whether Conklin committed "actual or constructive fraud" which caused damages

8

to Quentin Mang, to which the jury answered "yes". Issue two asked whether Conklin negligently caused damages to Quentin Mang, to which the jury answered "yes". Issues three and four asked whether defendant Iverson committed "actual or constructive fraud" and negligently caused damages to Quentin Mang, to which the jury answered "yes". Issues five and six asked the same two questions about the actions of defendant Place, to which the jury answered "no".

The verdict form then read:

> If you have answered "yes" to any of the six issues above and therefore, have found that one or more of the defendants has wrongfully caused damages to Quentin Mang, you should proceed to Issue No. 7.
> If, on the other hand, you have answered "no" to all of the six issues above and therefore, have found that none of the defendants have wrongfully caused damages to Quentin Mang, then your verdict is for the defendants and against Quentin Mang. You should proceed to issues related to John Gurnsey commencing at Issue No. 12.
>
> ISSUE NO. 7: What is the total amount of damages caused to Quentin Mang? (Do not consider comparative negligence of Quentin Mang, if any, in making this calculation).
>
> $  82,500
> Please proceed to Issue No. 8.
>
> ISSUE NO. 8: What amount of punitive or exemplary damages, if any, do you assess against each of the defendants?
>
> Defendant Conklin Co.:  $ 500,000.00
> Defendant Clyde Iverson: $ 100.00
> Defendant Robert Place:  $
>
> If you have assessed punitive damages against all three defendants, then proceed to Issue No. 11.
> If you have not, then proceed to Issue No. 9.
>
> ISSUE NO. 9: Was Quentin Mang negligent and did this negligence contribute to his damages?

9

Answer "yes" or "no".
ANSWER:   yes

If you answer "yes", please proceed to Issue No. 10. If you answer "no", please proceed to Issue No. 11.

ISSUE NO. 10: Assuming that 100% represents the combined negligence of the plaintiff and of the defendants whose negligence contributed as a cause to plaintiff's damages, what proportion of such combined negligence is attributable to the plaintiff on the one hand and what proportion is attributable to the defendants on the other hand?

|  | ANSWER: | |
|---|---|---|
| Defendant Conklin Company: | 61% |
| Defendant Robert Place: | 0% |
| Defendant Clyde Iverson: | 1% |
| Plaintiff Quentin Mang: | 38% |
| Total: | 100% |

The verdict form then relisted all of the above issues, but as to the claim of John Gurnsey. The jury again answered that both Conklin and Mr. Iverson had committed "actual or constructive fraud" and negligence. It again answered the questions "no" as to Mr. Place. It found that John Gurnsey suffered $50,000 in damages and assessed an additional $500,000 in punitives against Conklin and $100 in punitives against Mr. Iverson. It found Conklin 69% negligent, Mr. Iverson 1% negligent, and John Gurnsey 30% negligent.

The court has used a three-part standard to determine the adequacy of a special verdict form. Kinjerski v. Lamey (Mont. 1981), 635 P.2d 566, 38 St.Rep. 1703. The instructions must, 1) when read as a whole and in conjunction with the general charge; adequately present the contested issues to the jury; 2) fairly submit the issues to the jury; and 3) clearly submit to the jury the ultimate questions of fact. Kinjerski, 635 P.2d at 568. We conclude that the special

verdict form used in this case has failed to meet the standard in several respects.

Issues numbered 1, 2, 11, and 12 of the special verdict form asked the jury whether Conklin "caused" damages to the plaintiffs. One of the objections of Conklin to the special verdict form is the omission of any requirement that the jury find that the defendants' activities were the legal cause of the damages. We conclude that the questions should have been modified so that the jury could assess damages based upon the conduct of the defendants which was the legal cause of injury to the plaintiffs.

Special interrogatory Issue 8, punitive damages, was reached after the jury answered "yes" to any of issues 1 through 6. The verdict form does not specify that punitive damages can be awarded only under certain circumstances. Those circumstances are set out separately at Instruction No. 39. The necessary circumstances should have been incorporated into the special verdict form either by reference to Instruction No. 39 or by use of a statement of Issue No. 8 such as:

> If you find that the conduct of the defendant was grossly negligent, reckless, or malicious, what amount of punitive or exemplary damages, if any, do you assess against that defendant?

From the verdict form we are unable to determine whether the jury found constructive fraud, actual fraud, or both. On retrial, the verdict form should be revised to clarify this. The jury was instructed on the elements of constructive fraud in instructions number 20, 21, 22, 23, and 24. Conklin asserts that all the elements must be set out in one instruction so that it is clear to the jury that all elements must be present in order for constructive fraud to be found. On remand, the instructions should clearly state that all the

11

necessary elements of constructive fraud must be present before constructive fraud may be found.

## VI

Did the District Court err by not allowing the jury to compare like conduct?

Conklin offered a jury instruction which instructed the jury to compare "like conduct". It was refused. Conklin argues that this was error and that the jury should have had the opportunity to consider whether the plaintiffs acted in a reckless disregard of their own interests.

In Simonson v. White (Mont. 1986), 713 P.2d 983, 988, 43 St.Rep. 133, 139, this Court held that willful or wanton conduct may be compared with like conduct for the purpose of ascertaining damages. In this case, Conklin elicited testimony that Mr. Mang wrote out two checks for almost $6,000 for FEAST fertilizer after having met for two hours with Mr. Place and Mr. Iverson, then strangers to him; that neither plaintiff professed to have read the literature available to them on the FEAST program; that plaintiffs professed to being in the practice of signing contracts and letters without reading them. We conclude that Conklin presented a factual issue of whether plaintiffs engaged in willful and wanton conduct proximately causing their damages. For that reason, we hold that the lower court was in error in refusing the offered jury instruction on comparing like conduct.

## VII

Did the District Court err in its instructions on emotional distress?

Conklin asserts that the lower court erred in failing to instruct the jury that emotional damages should be awarded only if the jury concluded there was a substantial invasion of a legally protected interest which caused a significant impact upon the person of the plaintiff. In Johnson v.

12

Supersave Markets, Inc. (Mont. 1984), 686 P.2d 209, 213, 41 St.Rep. 1495, 1500, we concluded that such an instruction is required where there has been no proof of physical or mental injury to the plaintiff.

Here Mr. Gurnsey claimed aggravation of his heart condition and Mr. Mang claimed aggravation of his stomach and digestive condition. They do not contend that these conditions were the result of any direct physical or mental injury which resulted from the conduct of the defendants. Essentially their claims are that they suffered emotional injury, as a part of which there were aggravations of previously existing physical conditions. Under these circumstances we hold that the instruction described in Johnson should have been given. In the present case an award for emotional injury is proper only if the jury concludes that the defendants' conduct resulted in a substantial invasion of a legally protected interest, causing a significant impact upon either or both plaintiffs.

### VIII

Did the District Court err in its instructions on liability for the negligent selection of an independent contractor?

The court instructed the jury on agency principles and on the difference between agents and independent contractors. In Instruction No. 48, it further instructed the jury that, even if they found that the Conklin distributors were independent agents, Conklin could be held liable for the distributors' actions. Instruction No. 48 states in part:

> Defendant Conklin should be held responsible if it negligently failed to select competent or qualified contractors to do the work and that said failure caused the Plaintiffs' losses. Under this exception, the Defendant Conklin should be held responsible for damages if it negligently failed to

13

ascertain whether or not its independent contractors were competent or qualified to sell FEAST fertilizer or negligently failed to select contractors who possessed the measure of skill necessary to properly sell FEAST fertilizer.

In determining whether or not the Conklin Company has been negligent in the selection of people to perform the work in question you may consider evidence of whether said persons had the measure of skills necessary or experience necessary to do the work required. You can also consider the nature of the work to be performed and the risk of harm to others if it is not performed properly.

Conklin argues that this exception to the general rule on independent agents is inapplicable to fertilizer salesmen. The plaintiffs argue that this instruction is appropriate under Restatement (Second) of Torts § 411 (1986). That section states

§ 411. Negligence in Selection of Contractor

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
        (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
        (b) to perform any duty which the employer owes to third persons.

We adopt the limitation of § 411 which provides that liability is limited to physical harm. The jury instruction here did not contain such a limitation. We conclude that the giving of this instruction was error.

## IX

Did the plaintiffs fail in their burden of proof of punitive damages, and was the punitive damage award the result of passion, prejudice, or other error?

Plaintiffs did not submit any evidence to the jury on Conklin's net worth. Instead, they presented evidence of Conklin's dollar sales of FEAST fertilizer over a period of several years. Conklin says that the plaintiffs have failed to address one of the factors listed in Court's Instruction No. 40 for determining the amount of punitive damages: "the wealth and pecuniary ability of the Defendants."

Conklin has cited as authority for its position Safeco Ins. Co. v. Ellinghouse (Mont. 1986), 725 P.2d 217, 43 St.Rep. 1689. In that opinion, this Court listed as a factor in determining the amount of punitive damages "the relative wealth of the defendant." Although this would logically appear to include net worth, it does not require proof of net worth. Therefore, in a case such as the present case, in which the defendants' net worth does not support an award of punitive damages in the amount the plaintiffs seek, we conclude that it is up to the defendant to bring in the evidence if the plaintiff does not do so.

Conklin also argues that in light of its net worth of $2.9 million the award of $1 million in punitive damages is reversible because it is so excessive as to "shock one's conscience." See Safeco, 725 P.2d at 227. In light of the reversal of this judgment on other grounds, it is not necessary that we discuss this issue.

X

Did the District Court err by excluding evidence offered by Conklin?

This refers to a 1984 videotaped presentation on FEAST to a group of farmers in Great Falls. The videotape includes a statement by the presenter that FEAST is only a starter system, not a complete fertilization program. Plaintiffs successfully argued to the lower court that the presenter, who testified at trial, could testify that this disclaimer

15

was part of his presentation, and that the tape was unreliable and was made in contemplation of trial. Conklin argues that the tape should have been admitted as a response to plaintiffs' claims that Conklin and its distributors continued to misrepresent FEAST up to the day of trial. We affirm the trial court's ruling that the tape was not admissible at trial, because it was cumulative and because it was too likely to have been made in contemplation of trial.

The judgment is reversed and this case is remanded to the trial court for further proceedings consistant with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice William E. Hunt, Sr., dissenting:


Of the ten issues discussed in the majority opinion, I disagree with conclusions reached in eight. I will address each in the same order as the majority opinion.

The District Court refused to grant a mistrial regardless of testimony at trial concerning the death of John Gurnsey's wife. I believe that the lower court judge is in a much better position than this reviewing court to determine the impact of statements made during trial. The District Court judge did not deem the comment critical or prejudicial enough to warrant a mistrial. I would not overrule the District Court's judgment on this issue. Also, the jury verdict does not reflect that the jury was swayed by Gurnsey's comment about his wife. The award for compensatory damages was barely above Gurnsey's actual crop loss.

I would also affirm the District Court on the introduction of evidence concerning insurance carried by Conklin Co. The evidence was not admitted to show the existence of insurance or to prove negligence or liability of the party. The evidence was critical only to the issue of fraudulent and deceitful sales tactics on the part of Conklin's salesmen. As such, it was relevant and admissible.

The granting of a severance of trials for the purpose of establishing liability versus bad faith placed appellants in an awkward situation at trial. Much of the evidence relevant to proving bad faith was also relevant to proving liability. The admission of a letter written by Mang to the Department of Agriculture is such a piece of evidence. The letter was properly admitted at the trial to establish Conklin's liability, even though it may also be relevant as to the issue of bad faith at a later trial. Mang's solicitation of

17

help from the Department of Agriculture goes toward proving Conklin's business practices and the resulting damages to appellants.

Admission of the deposition testimony of other farmers who had used FEAST was not reversible error. The testimony was not offered to prove FEAST's capabilities or lack thereof. It was offered as evidence of Conklin's fraudulent representations to farmers depicting FEAST as a full fertilizer program. The testimony does not fall under hearsay, Rule 801, M.R.Evid., and was properly admitted.

I acquiesce in the holding that the special verdict form could have been better written. However, as presented to the jury, it was not inaccurate or misleading enough to justify a retrial. The special verdict form, read together with all jury instructions, adequately informed the jury of the applicable laws, definitions and criteria which must be met before finding Conklin liable and awarding damages.

In my opinion, the issue concerning the giving of an instruction comparing "like conduct" should also be affirmed. There is nothing in the record which suggests that either Mang or Gurnsey acted in a willfully reckless manner. If anything, appellants are guilty of being ignorant as to the capabilities of FEAST. Conklin agents knew, or should have known, enough about the product which they were selling to correctly inform the farmers. Because of this expertise as sales representatives, Conklin's employees should be held to a higher standard of conduct than purchasers of FEAST. There is no need to compare like conduct. To do so inaccurately raises appellants' standard of care and required degree of knowledge to that of respondents.

Given the facts of this case, the instruction given concerning emotional distress was not in error. Both Mang and Gurnsey had physical problems which were complicated and

18

exaggerated by the conduct of Conklin's employees. The "substantial invasion of a legally protected interest" language would be appropriate where there was no manifestation of physical harm caused by emotional distress.

As with the preceding issues, the majority would also reverse because of an alleged error by the District Court in giving an instruction on independent contractors. As with the preceding issues, I disagree with the majority.

It seems obvious from the facts that Conklin's salesmen were much more than independent contractors, excusing Conklin from any liability for their actions except in the case of negligent hiring which caused physical harm to third parties. Giving instruction no. 48, as quoted by the majority, was not an inaccurate statement of the law under the facts of this case.

I do agree with the majority opinion that where "defendants' net worth does not support an award of punitive damages in the amount plaintiffs seek,. . . it is up to the defendant to bring in evidence if the plaintiff does not do so." Likewise, I agree that the videotape offered as evidence by Conklin was properly refused admission by the District Court.

In careful consideration of the complete record and evidence submitted to the jury, I would affirm the verdict of the jury on all issues.

_____
Justice

Mr. Justice John C. Sheehy:

I concur in the foregoing dissent.

_____
Justice

19