JUSTICE TRIEWEILER
dissenting; joined by JUSTICE HUNT.
I dissent from the opinion of the majority.
The opinion of the majority is a tragic and misguided decision which once again demonstrates that, given a choice, the majority would protect the State rather than its citizens.
*192 This Court has now elevated the trust that people place in common carriers, such as buses and elevators, to a more important status than the trust that Montana citizens have a right to place in the public institutions that were created to protect societys most vulnerable people.
Greta Glover developed a severe mental disorder at the age of four years. She has been variously diagnosed as autistic, schizophrenic, and retarded. As a result of her condition, she is incapable of communicating with other people.
She has been institutionalized for the past 30 years, and has been a resident of the Montana Developmental Center (MDC) in Boulder, Montana since 1972. Her care was entrusted to Montana’s Department of Institutions because her mother, who cared for her until the age of 12, was no longer able to do so.
MDC exists to house, supervise, care for, and train Montana’s disabled citizens. Its residents are mentally and physically handicapped to the extent that they cannot care for themselves. These are truly societys most vulnerable people.
MDC hired Lloyd Dean Drummond to take care of Greta. He was responsible for her day-to-day care and protection, including all personal hygiene and bathing. He testified that in the course of caring for her, he sexually assaulted her by fondling her three to four times per week, and he raped her on three separate occasions. Because of her mental condition, Greta was unable to communicate and report this abuse to any other person. She was totally dependent on the care provided for her at MDC.
The majority opinion is based upon this Court’s previous decision in Kornec v. Mike Horse Mining Co. (1947), 120 Mont. 1, 180 P.2d 252, where we held that an employer is not vicariously liable for the torts of his employee when that employee’s conduct is outside the scope of his employment.
The modern rule of respondeat superior, and the exception on which the majority relies, are set forth in Restatement (Second) of Agency § 219 (1958). That section provides as follows:
(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) Amaster is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
(a) The master intended the conduct or the consequences, or
(b) The master was negligent or reckless, or
*193 (c) The conduct violated a nondelegable duty of the master, or
(d) The servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation. [Emphasis added.]
Respondeat superior is a common law principle. The majority relied on the common law to establish an exception to respondeat superior. See Kornec, 180 P.2d at 256-57. Furthermore, this Court has previously, by common law, established duties which are nondelegable. See Cash v. Otis Elevator Co. (1984), 210 Mont. 319, 684 P.2d 1041.
Why then has the majority suddenly decided that it is appropriate to come to a screeching halt in the evolution of the common law under these circumstances which so compellingly cry out for its logical extension?
Nondelegable duties are clearly an exception to the principle relied upon by the majority. Restatement (Second) of Agency § 214 (1958), provides that the duty assumed by the defendants in this case was nondelegable. It states as follows:
A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.
Section 214 is directly applicable to the facts presented in this case. The MDC was under a duty to provide for the protection and care of Greta Glover. It cannot avoid responsibility for failure to perform that duty by delegating it to Lloyd Dean Drummond.
The concept of nondelegable duty is not foreign to our common law. In Cash, we found that the owner of an elevator has a duty to exercise the highest degree of care in its maintenance and that that duty cannot be delegated to an independent contractor because of the potential danger if the elevator is not safely maintained. We did not defer to the legislature where the legislature had failed to act. We should not do so in this case.
Greta Glover was every bit as vulnerable, once placed under the care of the State of Montana, as people are who enter elevators or entrust their passage to other common carriers.
I agree with the decision of the Indiana Supreme Court in Stropes *194 v. Heritage House Children’s Center (Ind. 1989), 547 N.E.2d 244. That case presented facts identical to the facts in this case. The victim was a 14-year-old boy who, because of severe mental retardation and insufficient verbal skill, was unable to care for himself. He was, therefore, placed in a home for children as a ward of the county welfare department to assure his security and well-being. While there, he was sexually molested by a nurse’s aide who was responsible for his care.
The victim’s guardian filed a complaint for damages against the home to which he was entrusted. However, the trial court granted summary judgment on the basis that:
[T]he act of committing a sexual assault was, as a matter of law, outside the scope of Robert Griffin’s employment and, as a result, plaintiff cannot recover against The Heritage House, Inc. based upon a theory of respondeat superior.
Stropes, 547 N.E.2d at 246.
In other words, that case was dismissed by the trial court on the same basis that this case was reversed by the majority.
The Indiana Supreme Court characterized the issue on appeal as: [Wlhether, as a matter of law, Heritage may be subject to liability for its employee’s wrongful acts under the doctrine of respondeat superior as traditionally applied or under a theory of liability which has been described as the “common carrier” or “nondelegable duty” exception to respondeat superior.
Stropes, 547 N.E.2d at 247.
After careful consideration, the Indiana Supreme Court concluded that it was appropriate to extend the “common carrier” or “nondelegable duty” exception to respondeat superior to the circumstances in that case. As pointed out, we have already adopted a “common carrier” exception to the principles of respondeat superior. The only issue before us is whether to extend it to the circumstances in this case.
In language relevant to the issue before us, the Indiana Supreme Court concluded:
An examination of the relevant relationship here against the template of the common carrier exception and the rationales underlying it reveals that Heritage clearly assumed a nondelegable duty to be responsible for the care and safety of David Stropes. When Heritage accepted David as a result of its facility, it was fully cognizant of the disabilities and infirmities he suffered *195 which rendered him unable to care for himself and which, in fact, undoubtedly formed the basis of their relationship. Their “contract of passage” contemplated that the entire responsibility for David’s comfort, safety and maintenance would be on Heritage and that the performance of these tasks would be delegated to its employees. Given the degree of David’s lack of autonomy and his dependence on Heritage for care and the degree of Heritage’s control over David and the circumstances in which he found himself, we find that Heritage assumed a non-delegable duty to provide protection and care so as to fall within the common carrier exception. The standard of care which Heritage owed to David, therefore, was that actual care be used by Heritage and its employees to provide that protection. The trial court was in error to summarily reject his claim that such a duty existed.
Stropes, 547 N.E.2d at 253-54.
I would likewise conclude that given the degree of Greta’s dependence on the State of Montana for her care and the degree of control that is exercised over her, MDC assumed a nondelegable duty to provide for her protection and care and that it violated that duty when she was raped and sexually abused while in the State’s custody and care.
Contrary to the concerns expressed by the majority, such a holding would be totally consistent with the directives that have been enacted by the legislature. Section 53-20-101(1), MCA, which sets forth the purpose of Montana’s chapter pertaining to the developmentally disabled, states that:
The purpose of this part is to:
(1) secure for each person who may be developmentally disabled such treatment and habilitation as will be suited to the needs of the person and to assure that such treatment and habilitation are skillfully and humanely administered with full respect for the person’s dignity and personal integrity .... [Emphasis added.]
Section 53-20-142, MCA, in that same chapter, provides that:
Persons admitted to a residential facility for a period of habilitation shall enjoy the following rights:
(1) Residents have a right to dignity, privacy, and humane care.
(8) Each resident has a right to a humane physical environment within the residential facility.
*196 (10) Corporal punishment is not permitted.
Section 53-20-163, MCA, provides in relevant part as follows:
(1) Every residential facility shall prohibit mistreatment, neglect, or abuse in any form of any resident.
In their concern for deference to the legislature, the majority have actually defeated the express intentions of the legislature. These statutory obligations are meaningless if the State of Montana and MDC can avoid liability for breaching the duties these statutes impose by simply contending that the duty was breached by one of the State’s employees. The State has no way of acting other than through its employees.
The majority’s rationale is that protection of people like Greta Glover is not our responsibility — it is up to the legislature.
It is true that where the legislature has preempted the common law, this Court should defer to that branch of government. However, it is equally clear that where the legislature has not acted to regulate the affairs of people, this Court has an obligation to do so through the common law. This obligation is made clear by both our previous decisions and legislative statute. See Haker v. Southwestern Railway Co. (1978), 176 Mont. 364, 578 P.2d 724, and § 1-1-108, MCA.
The majority’s expressed concern about acting in an area that should be reserved for the legislature is indeed a shallow basis for this result. It has shown no similar reluctance in the past under much less compelling circumstances.
The common law of this State is replete with examples of this Court’s willingness to act where a vacuum exists in an important area of public policy that involves the rights of the litigants who appear before us. This Corut adopted the law of strict liability without waiting for the legislature to do so in Brandenburger v. Toyota (1973), 162 Mont. 506, 513 P.2d 268. It allowed damages for loss of consortium by minors in Pence v. Fox (1991), 248 Mont. 521, 813 P.2d 429. This Court rewrote the law regarding bad faith in commercial transactions without waiting for the legislature to do so in Story v. City of Bozeman (1990), 243 Mont. 436, 791 P.2d 767. In fact, this Court originally adopted the very exception to respondeat superior that forms the basis of this decision without waiting for the legislature to do so. Kornec v. Mike Horse Mining Co. (1947), 120 Mont. 1, 180 P.2d 252. Why is the majority willing to adopt by common law part of the rule on respondeat superior which is set forth in Restatement (Second) of *197 Agency § 219 (1958), but unwilling to adopt the rest of that same rule by the same process?
This Court was willing to adopt a rule of nondelegable duty for owners of elevators, and presumably other common carriers, such as buses, trains, and ski lifts. Cash v. Otis Elevator Co. (1984), 210 Mont. 319, 684 P.2d 1041. Why is it any significant departure from what was done in Cash to extend the same protection to an autistic, retarded woman incapable of protecting herself or communicating with others when she has been sexually abused by the employees of the very institution in which she was placed for her protection and care?
I agree with Justice Benjamin Cardozo, who stated in his treatise, Law and Literature (1931), “[t]he common law, unless bound and riveted by statute, has instruments at hand of many varieties and shapes for molding of that justice which is the end of her endeavor.”
This Court is willing to use the common law selectively where it suits the majority’s notions of sound public policy. However, it has abdicated that important responsibility in this case.
The primary reason for which an independent branch of government, such as the judiciary, exists is to protect the rights of private individuals from governmental abuse. There can be no clearer example of governmental abuse than when one of its agents sexually abuses and rapes a retarded woman who had been placed in the government’s care and entrusted to the government for her protection. I, therefore, dissent from the majority’s decision to reverse the District Court’s determination of the defendant’s liability.
I also dissent from that part of the majority opinion which holds that Margaret Maguire was not a direct victim of Dean Drummond’s tortious conduct, and therefore, cannot recover damages for the emotional distress she has experienced.
Margaret Maguire is Greta Glover’s mother and legal guardian. She cared for her daughter until Greta was 12 years of age, when she was no longer able to do so. After her daughter was admitted to state institutions, Margaret visited her frequently and took her home on weekends.
On November 16, 1988, she was advised that her daughter was pregnant. Her daughter was incapable of deciding what to do about the pregnancy. Therefore, Margaret had to make those decisions for her. Margaret literally substituted herself for Greta in terms of all the difficult decisions that are attendant to an unwanted pregnancy. She was concerned about Greta’s health and was concerned about *198 whether Greta could deliver a healthy baby. Yet, because of her religious beliefs, she could not choose an abortion. In the process of making these decisions, her health deteriorated and she required both psychological and medical treatment.
After the baby was bom on April 4, 1989, she had to make the decision to place the baby for adoption, just as if it was her own child. Following the decision to have the baby adopted, she was hospitalized for depression with symptoms of starvation and thoughts of suicide. Her doctors related these severe health problems to the decisions she was forced to make about Greta’s pregnancy and the adoption of the baby.
If any person with the intellectual capacity to make her own decisions was raped and suffered physically and mentally, as Margaret Maguire did because of the decisions that had to be made following that rape, there is no question that person would be entitled to compensation for those emotional and physical injuries. Margaret Maguire was no less a direct victim of Dean Drummond’s conduct than Greta Glover.
In Johnson v. Supersave Markets, Inc. (1984), 211 Mont. 465, 686 P.2d 209, we held that:
This Court adopts the species of case approach which requires a factual analysis of each case to determine whether the alleged “emotional distress” merits compensation. In determining whether the distress is compensable absent a showing of physical or mental injury, we will look to whether tortious conduct results in a substantial invasion of a legally protected interest and causes a significant impact upon the person of the plaintiff.
Johnson, 686 P.2d at 213.
The instruction given to the jury regarding Margaret Maguire’s right to recover damages for her own emotional distress was completely consistent with our directive in Johnson. The jury was instructed as follows:
If you find that the State of Montana was responsible in causing Margaret Maguire emotional distress, the plaintiff, Margaret Maguire, may be entitled to recover damages. You are instructed that Margaret Maguire had a right to be free from the emotional distress caused by being obligated to make decisions regarding the pregnancy of her daughter and ward, Greta Glover. Before damages for emotional distress may be awarded, you must find that the defendant, State of Montana, substantially invaded that *199 right and that this invasion caused a significant impact upon the plaintiff, Margaret Maguire, and resulted in severe emotional distress.
The majority cites to Marlene F. v. Psychiatric Med. Clinic (Cal. 1989), 770 P.2d 278, and Molien v. Kaiser Foundation Hospitals (Cal. 1980), 616 P.2d 813. In both of these cases, plaintiffs were entitled to claim damages for emotional distress, even though they were not the direct victim of the negligent conduct which gave rise to their claims. The basis for recovery in both cases was that they were owed a duty of care by the tort-feasor. The majority concludes that the existence of that duty “depends upon the foreseeability that severe emotional distress will result from the breach of that duty.” Certainly, on that basis, the State of Montana owed a duty to Margaret Maguire in this case. Not only did she entrust her daughter to them with the understanding that they would provide for her care and security, but it was obvious to the employees of MDC that it was Margaret Maguire who necessarily made every decision that affected Greta Glover’s personal life. How could it not be foreseeable that if Greta Glover was raped and impregnated, that Margaret Maguire would be left with all of the decisions made necessary because of that pregnancy?
The majority decision is disturbing on several levels. First, and most importantly, it unnecessarily deprives the plaintiffs, who have suffered so much from such brutal treatment by the agents of the State, from the necessary compensation with which they could begin putting their lives back together. Second, it sets a terrible precedent which will be applied to bar future victims of intentional abuse by State employees from reasonable compensation, no matter how serious and devastating their loss. Finally, this Court’s decision regarding Margaret Maguire’s damages, creates the fiction that Margaret Maguire was not a direct victim of Dean Drummond’s brutal conduct. This decision ignores the reality of this lady’s unique situation and this family’s terrible suffering.
For these reasons, I dissent from Parts I, III, and IV of the majority decision. I would affirm the judgment of the District Court.
JUSTICE HUNT joins in the foregoing dissent of JUSTICE TRIEWEILER.