No. 91-313

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

MARGARET MAGUIRE, individually
and as Guardian of MARY MARGRETTA
GLOVER, an Incapacitated Person and
BABY GLOVER,

Plaintiffs and Respondents,

-vs-

THE STATE OF MONTANA, MONTANA
DEPARTMENT OF INSTITUTIONS, THE
MONTANA DEVELOPMENTAL CENTER AND
CARROLL V. SOUTH, Director of
Department of Institutions,

Defendants and Appellants.

FILED

AUG 12 1992

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Second Judicial District,
               In and for the County of Silver Bow,
               The Honorable Mark P. Sullivan, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Sam E. Haddon argued, Boone, Karlberg & Haddon,
            Missoula, Montana
            G. Curtis Drake, Keller, Reynolds, Drake, Sternhagen
            & Johnson, Helena, Montana

        For Respondent:

            William P. Joyce argued, Burgess, Joyce & Whelan,
            Butte, Montana

                                 Submitted :   March 10, 1992

                                 Decided:   August 12, 1992

Filed:

_____
                    Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

The State of Montana appeals a jury verdict in favor of Margaret Maguire, individually and as guardian of Mary Margretta Glover and from a judgment of the Second Judicial District Court, Silver Bow County. We affirm in part and reverse in part.

We address the following issues on appeal:

1. Whether the District Court erred in granting partial summary judgment and in directing a verdict that the State was liable for criminal conduct of an employee under Restatement (Second) of Agency § 214;

2. Whether the District Court erred in refusing the State's offer of proof, based on Rule 408, M.R.Evid., that Mrs. Maguire acknowledged that Ms. Glover was receiving good care at the Montana Developmental Center and that she should not be moved;

3. Whether the District Court erred in refusing to instruct on the theories of agency and negligent hiring;

4. Whether the District Court erred in allowing Mrs. Maguire to maintain an action in tort for emotional distress; and

5. Whether the District Court erred in refusing to reduce the jury's verdict.

In 1988, Mary Margretta Glover (Glover) an autistic and severely retarded patient at Montana Developmental Center (MDC), was assaulted and raped by an MDC employee, Lloyd Dean Drummond. Ms. Glover, age 43, has resided at what is now MDC since 1979. In 1988, MDC assigned Lloyd Drummond the primary responsibility for

2

caring for Ms. Glover. His duties included bathing and dressing Ms. Glover.

Margaret Maguire (Maguire), Ms. Glover's mother and legal guardian, brought Ms. Glover home for weekend visits. During one of the visits, Ms. Glover laid flat on her back, spread her legs, and placed her knees up towards her shoulders. During another visit, Mrs. Maguire noticed Ms. Glover was gaining weight. Mrs. Maguire telephoned MDC personnel to question them about Ms. Glover's weight gain. She also inquired as to whether or not Ms. Glover was having regular menses. She was informed that Ms. Glover had missed her menses, but that it was probably due to thorazine treatment. However, MDC staff members also noticed Ms. Glover's weight gain and commented to the head nurse that they wished to be the first ones to tell Lloyd Drummond that he was going to be a father.

In November of 1988, a pregnancy test on Ms. Glover came back positive. Ms. Glover delivered the baby without incident in April of 1989. As Ms. Glover's legal guardian, Mrs. Maguire had to make decisions regarding her daughter's pregnancy. Fear that Ms. Glover's autism and retardation might be congenital made a decision to carry the pregnancy to term difficult. Further, Mrs. Maguire was concerned for her daughter's safety. As a devout Roman Catholic, making a decision to abort the pregnancy was also very difficult. Ultimately Mrs. Maguire decided to have the pregnancy carried to term. However, she faced another difficult decision in whether to raise the child herself or place the child in an

3

adoptive home. In view of her advanced age, she finally decided to place the child with adoptive parents.

In December of 1988, Mrs. Maguire sought medical attention for stress and depression related to the rape and pregnancy of her daughter. Her physician, who previously treated Mrs. Maguire for depression and anxiety related problems, noted her stress had increased and that she had deteriorated "markedly." She complained of trouble sleeping, nightmares, contemplation of suicide, and generally feeling run down. Mrs. Maguire's visits to the doctor increased, and her condition did not begin to improve until April of 1989, but she continued to see a psychologist through 1990.

Our standard of review as to the verdict is whether there is substantial credible evidence in the record to support the jury verdict. In reviewing conclusions of law, question of law, or legal components of ultimate facts, or mixed questions of law and fact, we will decide if the lower court's determination as to law is correct. The scope of review of discretionary acts of the trial court is whether the trial court abused its discretion. Our review will be plenary. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 803 P.2d 601.

I

Whether the District Court erred in granting partial summary judgment and directing a verdict holding the State liable for the criminal conduct of its employee, based on Restatement (Second) of Agency, § 214.

The District Court granted partial summary judgment and

4

directed a verdict in favor of Mrs. Maguire and Ms. Glover on the issue of liability. The District Court based its decision on Restatement (Second) of Agency § 214. Section 214 is an exception to the general rule of respondeat superior. We have not heretofore adopted this section. This section provides:

> **Failure of Principal to Perform Non-delegable Duty.**
> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance or such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

We have previously analyzed cases under the respondeat superior doctrine based on Restatement (Second) of Agency § 228. Respondeat superior imposes liability on an employer for the wrongful acts of an employee which are committed within the scope of his employment. As we stated in Kornec v. Mike Horse Mining (1947), 120 Mont. 1, 8, 180 P.2d 252, 256,

> The servant or agent must have been acting in the "course of his employment," in "furtherance of his employer's interest," or "for the benefit of his master;" "in the scope of his employment," etc. But a servant who acts entirely for his own benefit is generally held to be outside the scope of his employment and the master is relieved of liability. (Citation omitted.)

See also Lutz v. United States (9th Cir. 1982), 685 F.2d 1178.

A party may be held vicariously liable for the damages caused by another on the theory of respondeat superior or may be held directly liable on the theory of negligent hiring and/or supervision. Normally, an employer would not be held liable for tortious acts of its employee performed outside the scope of employment. Hoover v. University of Chicago Hospitals (Ill. 1977),

5

366 N.E.2d 925, 929. Thus, under respondeat superior, the employer's liability is derivative from the negligent acts of the employee acting within the scope of employment. Boykin v. District of Columbia (D.C.App. 1984), 484 A.2d 560, 561. It is clear this rape was outside the scope of Lloyd Drummond's employment.

Other jurisdictions, under theories of vicarious liability, hold an employer liable for the tortious acts of its employees acting outside the scope of employment. These cases involve common carriers and innkeepers. In G.L. v. Kaiser Foundation Hospitals (1987), 88 Or.App. 528, 746 P.2d 731, 734, the Oregon Court of Appeals deferred to the legislature in declining to hold hospitals strictly liable for tortious acts of employees acting outside the scope of employment (sexual assault). The question of an employer's vicarious liability for the tortious acts of its employees acting outside the scope of employment is a matter of first impression in Montana.

Both appellant and respondent cite cases from other jurisdictions which produce opposite results. MDC relies on Rabon v. Guardsmark, Inc. (4th Cir. 1978), 571 F.2d 1277. In Rabon, the Fourth Circuit held that neither South Carolina common law nor South Carolina statutes justify application of the non-delegable duty rule of § 214 to the employer of a security guard (rape). The Fourth Circuit found that South Carolina only recognized the non-delegable duty exception to the general rule of respondeat superior in cases involving common carriers. Rabon at 1280.

Mrs. Maguire relies on Stropes v. Heritage House Childrens

6

Ctr. (Ind. 1989), 547 N.E.2d 244, for her analysis that Montana should adopt the non-delegable duty exception to the respondeat superior doctrine. Stropes involves a similar fact situation. In Stropes a severely retarded fourteen-year-old boy was raped by a nurse's aide employed by Heritage House. The aide's duties included feeding, bathing, and changing the child. The rape occurred after the aide entered the boy's room to change his clothing and bedding. Stropes at 245.

The Indiana Supreme Court, in reviewing Indiana case law, found two cases which held employers liable for criminal acts of their employees, because the acts "originated in activities so closely associated with the employment relationship as to fall within its scope." Stropes at 247.

The Stropes court also distinguished Rabon. As noted above, the Fourth Circuit determined that South Carolina's non-delegable duty doctrine only extended to common carriers. Stropes at 250-251. However, as Stropes pointed out, Indiana has identified principles underlying its adoption of the exception, and, in fact, has extended it to reach enterprises other than common carriers. Stropes at 252. The Indiana Supreme Court concluded that the relevant relationships embodied in the common carrier exception, and the rationales underlying it, were applicable to Heritage. Stropes at 253-254.

Montana follows the doctrine of respondeat superior as expounded in Kornec. We have not adopted the common carrier exception to that doctrine. However, we have accepted the concept

7

of a non-delegable duty in a contractual relationship between a general contractor and an independent contractor. Ulmen v. Schwieger et al. (1932), 92 Mont. 331, 12 P.2d 856. Ulmen involved a highway contract. We concluded that there was a non-delegable duty based on the inherently dangerous and hazardous nature of the project to the public. Ulmen at 347, 12 P.2d at 859. In Ulmen this duty was extended to third parties.

Later, we held that a general contractor had a non-delegable duty to the employee of a subcontractor based on a statutory duty to maintain safety at the worksite. Stepanek v. Kober Const. (1981), 191 Mont. 430, 625 P.2d 51. Stepanek involved a construction injury after a fall from a scaffold. In Cash v. Otis Elevator (1984), 210 Mont. 319, 684 P.2d 1041, this Court adopted a higher standard of care for the owner of a premises with respect to operation of an elevator. We determined that an elevator performs the function of a common carrier and that the owner of the elevator had a non-delegable duty as to the safety of the elevator because elevators are inherently dangerous. Cash at 324, 684 P.2d at 1043.

In summary, we have limited application of the non-delegable duty exception to the respondeat superior doctrine to instances of safety where the subject matter is inherently dangerous. We decline to extend the exception to the facts here. There are a number of reasons for and against extending the liability of the employer, such as here, when an intentional tort is committed only because of or by virtue of the employment situation. The employer

8

is better able to attempt to avoid such wrongs. The employer has the ability to minimize them, while the victim has no control over the situation. Such a burden is incidental to running a business. However, such a major change to the respondeat superior doctrine is best left to the legislature.

Massachusetts declined to extend the non-delegable duty exception to group day care centers because it would constitute a significant extension of Massachusetts law. Worcester Ins. v. Fells Acres Day School (1990), 408 Mass. 393, 558 N.E.2d 958, 968. (Rape and indecent assault.) Likewise creating a major exception to the respondeat superior doctrine, by extending liability to a caretaker, would constitute a significant extension of Montana law. Without support of prior judicial decisions, such an extension of liability should come from the legislature. See Sandman v. Hagan (Iowa 1968), 154 N.W.2d 113, 118-119. We conclude that the District Court erred in its determination to apply § 214 of the Restatement (Second) of Agency to the facts here. We reverse the District Court on this issue. Inasmuch as we are reversing on the first issue, our discussion of the balance of the issues is advisory for the purpose of a second trial.

## II

Whether the District Court erred in refusing the State's offer of proof, based on Rule 408, M.R.Evid., that Mrs. Maguire acknowledged Ms. Glover was receiving good care at the Montana Developmental Center and that she should not be moved.

Rule 408, M.R.Evid., provides:

**Compromise and offers to compromise.**
Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Based on Rule 408, the District Court excluded testimony from defendant's witness, Jennifer Pryor, that Mrs. Maguire did not want Ms. Glover moved from MDC. MDC cites the commissioners' comments to the Rule that parties should not try to immunize their evidence from being admissible by presenting it during negotiations. The third sentence of the Rule allows evidence which is otherwise discoverable.

MDC sought to introduce testimony that Mrs. Maguire did not want Ms. Glover moved from MDC because it was close to Butte and that she thought Ms. Glover was receiving good care at MDC. Moreover, evidence existed that Mrs. Maguire rejected an offer of alternative placement for Ms. Glover during settlement negotiations. Counsel for MDC admitted that placement outside of MDC was part of the proposed settlement.

Further, Mrs. Maguire testified on cross-examination that MDC was the best place she could find for her daughter and that she wanted to keep her close to Butte. Thus, proposed testimony by MDC

10

was repetitive. We conclude the evidence does not fall within the exception offered by MDC in the commissioners' comments. For the reasons stated above, we affirm the District Court on this issue.

III

Whether the District Court erred in refusing to instruct on the theories of agency and negligent hiring.

Because the District Court adopted the non-delegable duty exception to the respondeat superior doctrine, it refused MDC's proposed instructions on negligent hiring and agency. We concluded above that the District Court erred in adopting the non-delegable duty exception to Montana's respondeat superior doctrine. Thus, we reverse the District Court on this issue.

Section 53-20-142, MCA, provides in part:

> Persons admitted to a residential facility for a period of habilitation shall enjoy the following rights:
> (1) Residents have a right to dignity, privacy, and humane care . . .

MDC has a statutory duty to Ms. Glover not inconsistent with the theories of negligent hiring, negligent supervision, and agency. Thus it was error for the District Court to refuse instructions based on these theories.

IV

Whether the District Court erred in allowing Mrs. Maguire to maintain an action in tort for emotional distress.

The District Court limited Mrs. Maguire's recovery for emotional distress to those damages caused by being required to make the decisions regarding the pregnancy of Ms. Glover. The jury was instructed not to award damages for emotional distress as a

11

result of Mrs. Maguire's learning of her daughter's rape and pregnancy. This latter instruction was correct. In the past we have allowed recovery to a third party for contemporaneous observance of an accident or event resulting in shock to the senses. Versland v. Caron Transport (1983), 206 Mont. 313, 671 P.2d 583.

In Versland we traced the history of case law from a denial of recovery for damages for emotional trauma if there was no physical impact to an expansion to the "zone of danger" rule. The "zone of danger" rule allows the plaintiff recovery if he or she were located within the zone of defendant's negligent conduct and feared for his or her own safety. We abandoned this rule using the reasoning of the seminal case of Dillon v. Legg (1968), 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912. In Versland, we adopted guidelines derived from Dillon, and articulated a three part test for third party claims for negligent infliction of emotional distress:

> 1. The shock must result from a direct emotional impact upon the plaintiff from the sensory and contemporaneous perception of the accident, as contrasted with learning of the accident from others after its occurrence.
> 2. The plaintiff and victim must be closely related, as contrasted with absence of any relationship or the presence of only a distant relationship.
> 3. Either death or serious physical injury of the victim must have occurred as a result of the defendant's negligence.

Versland at 322, 671 P.2d 583.

Part (1) of this test is in line with, and an amplification of, prong 2(a) of Section 46 of the Restatement of Torts relative

12

to intentional and reckless conduct. This is sometimes referred to as the tort of outrage. See Lund v. Caple (1984), 100 Wash.2d 739, 675 P.2d 226. Restatement (Second) of Torts § 46 provides:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
> > (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> > (b) to any other person who is present at the time, if such distress results in bodily harm.

The case before us fails to meet part one of the Versland three part test and part 2 of § 46 of the Restatement in that Mrs. Maguire, the plaintiff herein, was not present at the time of the conduct. She learned of the conduct from others. The policy behind the presence requirement is to limit the number of persons who may recover for emotional distress and to guarantee the genuineness of the claim. See Marlene F. v. Psychiatric Med. Clinic (Cal. 1989), 257 Cal.Rptr. 98, 770 P.2d 278, 285. JJ. Arguelles and Eagleson concurring.

The theory submitted to the jury was whether or not Mrs. Maguire may recover for damages for emotional distress for being required to make decisions regarding the pregnancy of her daughter; those decisions being whether or not the daughter should have an abortion and if not, to provide for the care or adoption of the child. No direct relationship exists between any outrageous act and Mrs. Maguire. To find an independent cause of action here goes

13

beyond the rationale and tests of the <u>Dillon</u> and <u>Versland</u> progeny and goes beyond the physical presence requirement.

We have allowed recovery for emotional distress absent physical injury in only limited circumstances. In Johnson v. Supersave Markets, Inc. (1984), 211 Mont. 465, 686 P.2d 209 and Niles v. Big Sky Eyewear (1989), 236 Mont. 455, 771 P.2d 114, we allowed recovery for emotional distress damages for false imprisonment in jail. In both <u>Johnson</u> and <u>Niles</u> the victim was not a third party.

A caveat to § 46 provides: "The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress." As Justice Arguelles points out, the caveat speaks to situations which may not mandate the presence requirement. <u>Marlene F.</u> at 105, 770 P.2d at 285, quoting § 46 com. 1, p. 79. In <u>Marlene F</u> the California Supreme Court held a mother of a child could state a claim for negligent infliction of emotional distress after a psychologist treating both the mother and child, sexually molested the child. <u>Marlene F</u> at 103, 770 P.2d at 283. The court reasoned that damages are recoverable when the defendant owes a duty of care to the plaintiff. The existence of the duty depends upon the foreseeability that severe emotional distress will result from the breach of that duty. <u>Marlene F</u> at 101-102, 770 P.2d at 281-282.

Justice Eagleson, in his concurring opinion in <u>Marlene F</u>, points out that the relationship between the psychotherapist and

14

patient gives rise to a duty to refrain from conduct that foreseeably will harm the patient. He also points out that an earlier decision permitted a husband a cause of action for emotional distress after a doctor misdiagnosed his wife as having syphilis. The husband was not present at the diagnosis. Marlene F at 108, 770 P.2d at 288, citing Molien v. Kaiser Foundation Hospitals (1980), 167 Cal.Rptr. 831, 616 P.2d 813. In Molien the court reasoned that the doctor assumed a duty to the husband when he directed the wife to communicate the diagnosis to him, thus it was foreseeable to the doctor that a misdiagnosis would cause the husband emotional distress. Molien at 835, 616 P.2d at 817. In reality, the plaintiffs in Molien and Marlene F. could be considered "direct victims" of the tortious conduct.

Relying on Marlene F., the California Supreme Court distinguished the bystander-witness cases of the Dillon progeny. In Christensen v. Superior Court (1991), 2 Cal.Rptr.2d 79, 91, 820 P.2d 181, 193, certain mortuaries and crematoria wrongfully mishandled the decedents' remains. Despite failing to satisfy the presence requirement, family members were allowed standing to recover for negligent infliction of emotional distress. Christensen at 99, 820 P.2d at 201. The defendants assumed a duty to the close relatives of the decedents for whose benefit they were to provide services. Further, the court reasoned that the defendants "created a special relationship with the close family members obligating them to perform those services in a dignified and respectful manner." Christensen at 91, 820 P.2d at 193.

We are faced with the question here whether the facts before

15

us satisfy the causation and the foreseeability requirements when the presence requirement is not met. In our view, doing so here would increase the spiral of liability farther out than other jurisdictions have chosen to go. See H.L.O. by L.E.O. v. Hossle (Iowa 1986), 381 N.W.2d 641, 644-645; Nancy P. v. D'Amato (Mass. 1988), 401 Mass. 516, 517 N.E.2d 824, 828.

In the case before us, MDC did not assume a duty towards Mrs. Maguire. The existence of a duty of care depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against the imposition of liability. See Slaughter v. Legal Process and Courier Service (1984), 162 Cal.App.3d 1236, 1249, 209 Cal.Rptr. 189, 196. The facts before us are not sufficiently similar to the duty the doctor assumed in Molien by instructing the wife to inform her husband about the diagnosis. Nor is it analogous to the special relationship created between the psychotherapist and patient in Marlene F. The fact situation in Christensen comes the closest to the facts before us. However, while the morticians and crematoria assumed a duty to the close relatives (of the decedents) for whose benefit they were performing funeral and related services, MDC did not assume such a similar duty to Mrs. Maguire. There was no close connection between the extreme and outrageous acts and Mrs. Maguire's injury. She is neither a "direct victim," nor was she present at the time of conduct, nor a victim under specific special parasitic circumstances.

We therefore decline to extend liability to allow Mrs. Maguire to recover for either negligent infliction of severe emotional

16

distress or intentional infliction of severe emotional distress. We reverse the District Court on this issue.

V

Whether the District Court erred in refusing to treat the separate recoveries as a single claim of damages under § 2-9-108, MCA.

Under § 2-9-108, MCA, the legislature imposed a $750,000 limit on each claim against the State. Section 2-9-108, MCA (1991) (temporary), states in part:

> (1) Neither the state, a county, municipality, taxing district, nor any other political subdivision of the state is liable in tort action for damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $750,000 for each claim and $1.5 million for each occurrence.

The rape and subsequent pregnancy were the subjects of Mrs. Maguire's original complaint. During the trial, Drummond admitted to raping Ms. Glover on two additional occasions.

Under § 2-9-108, MCA, a party is entitled to $750,000 for each claim. We agree with the District Court that each rape was a separate wrongful act. We conclude that the District Court did not err in refusing to treat the recoveries as based on a single claim.

MDC also contends that the verdict forms were improper. The jury did not separate its damage award among the separate claims. The District Court found that MDC raised the limitation of § 2-9-108, MCA, as a defense in its amended answer and jury demand. Further, the District Court found that it was MDC's responsibility to present a verdict form which would allow the jury to apportion its damage award applying § 2-9-108, MCA. We agree with the

17

District Court that the responsibility rested with MDC to present separate verdict forms; we therefore affirm the District Court on this issue.

For the reasons stated above, we affirm in part and reverse in part and remand to the District Court for proceedings not inconsistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

18

Justice John Conway Harrison specially concurring.

I concur in the result reached by majority in this opinion holding that the District Court erred in granting partial summary judgment based on Restatement (Second) of Agency § 214. As noted in the opinion, this Court has not previously adopted this section as law in Montana and, in my opinion, it is unfortunate that the District Court did in this case.

In concurring with the result of this case, I do not in any manner approve, condone or support the apparent indifferent hiring practices employed by the State of Montana in this case. The fact situation of this case clearly illustrates the unconcerned hiring practices implemented by the State--it is appalling that it clearly took little or no interest in the character or integrity of this defendant who was hired to care for our disabled or disadvantaged. The State's investigation of potential employees should have prevented the hiring of such a man, who, during the course of his employment with the State of Montana, brought discredit not only to himself and to the institution but also to the other employees of that institution who are devoted and who truly care for our unfortunate citizens. The citizens of this State who suffer the misfortune of having family members in such institutions deserve both the peace of mind and the assurance that their loved ones are safe and well cared for.

_John Conway Harrison_
Justice

Justice Terry N. Trieweiler dissenting.

I dissent from the opinion of the majority.

The opinion of the majority is a tragic and misguided decision which once again demonstrates that, given a choice, the majority would protect the State rather than its citizens.

This Court has now elevated the trust that people place in common carriers, such as buses and elevators, to a more important status than the trust that Montana citizens have a right to place in the public institutions that were created to protect society's most vulnerable people.

Greta Glover developed a severe mental disorder at the age of four years. She has been variously diagnosed as autistic, schizophrenic, and retarded. As a result of her condition, she is incapable of communicating with other people.

She has been institutionalized for the past 30 years, and has been a resident of the Montana Developmental Center (MDC) in Boulder, Montana since 1972. Her care was entrusted to Montana's Department of Institutions because her mother, who cared for her until the age of 12, was no longer able to do so.

MDC exists to house, supervise, care for, and train Montana's disabled citizens. Its residents are mentally and physically handicapped to the extent that they cannot care for themselves. These are truly society's most vulnerable people.

MDC hired Lloyd Dean Drummond to take care of Greta. He was responsible for her day-to-day care and protection, including all

20

personal hygiene and bathing. He testified that in the course of caring for her, he sexually assaulted her by fondling her three to four times per week, and he raped her on three separate occasions. Because of her mental condition, Greta was unable to communicate and report this abuse to any other person. She was totally dependent on the care provided for her at MDC.

The majority opinion is based upon this Court's previous decision in *Kornec v. Mike Horse Mining Co.* (1947), 120 Mont. 1, 180 P.2d 252, where we held that an employer is not vicariously liable for the torts of his employee when that employee's conduct is outside the scope of his employment.

The modern rule of *respondeat superior*, and the exception on which the majority relies, are set forth in Restatement (Second) of Agency § 219 (1958). That section provides as follows:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

> (a) The master intended the conduct or the consequences, or

> (b) The master was negligent or reckless, or

> (c) <u>The conduct violated a nondelegable duty of the master</u>, or

> (d) The servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation. [Emphasis added.]

21

*Respondeat superior* is a common law principle. The majority relied on the common law to establish an exception to *respondeat superior*. *See Kornec*, 180 P.2d at 256-57. Furthermore, this Court has previously, by common law, established duties which are nondelegable. *See Cash v. Otis Elevator Co.* (1984), 210 Mont. 319, 684 P.2d 1041.

Why then has the majority suddenly decided that it is appropriate to come to a screeching halt in the evolution of the common law under these circumstances which so compellingly cry out for its logical extension?

Nondelegable duties are clearly an exception to the principle relied upon by the majority. Restatement (Second) of Agency § 214 (1958), provides that the duty assumed by the defendants in this case was nondelegable. It states as follows:

> A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

Section 214 is directly applicable to the facts presented in this case. The MDC was under a duty to provide for the protection and care of Greta Glover. It cannot avoid responsibility for failure to perform that duty by delegating it to Lloyd Dean Drummond.

The concept of nondelegable duty is not foreign to our common law. In *Cash*, we found that the owner of an elevator has a duty to

22

exercise the highest degree of care in its maintenance and that that duty cannot be delegated to an independent contractor because of the potential danger if the elevator is not safely maintained. We did not defer to the legislature where the legislature had failed to act. We should not do so in this case.

Greta Glover was every bit as vulnerable, once placed under the care of the State of Montana, as people are who enter elevators or entrust their passage to other common carriers.

I agree with the decision of the Indiana Supreme Court in *Stropes v. Heritage House Children's Center* (Ind. 1989), 547 N.E.2d 244. That case presented facts identical to the facts in this case. The victim was a 14-year-old boy who, because of severe mental retardation and insufficient verbal skill, was unable to care for himself. He was, therefore, placed in a home for children as a ward of the county welfare department to assure his security and well-being. While there, he was sexually molested by a nurse's aide who was responsible for his care.

The victim's guardian filed a complaint for damages against the home to which he was entrusted. However, the trial court granted summary judgment on the basis that:

> [T]he act of committing a sexual assault was, as a matter of law, outside the scope of Robert Griffin's employment and, as a result, plaintiff cannot recover against The Heritage House, Inc. based upon a theory of respondeat superior.

*Stropes*, 547 N.E.2d at 246.

23

In other words, that case was dismissed by the trial court on the same basis that this case was reversed by the majority.

The Indiana Supreme Court characterized the issue on appeal as:

> [W]hether, as a matter of law, Heritage may be subject to liability for its employee's wrongful acts under the doctrine of respondeat superior as traditionally applied or under a theory of liability which has been described as the "common carrier" or "non-delegable duty" exception to respondeat superior.

*Stropes*, 547 N.E.2d at 247.

After careful consideration, the Indiana Supreme Court concluded that it was appropriate to extend the "common carrier" or "nondelegable duty" exception to *respondeat superior* to the circumstances in that case. As pointed out, we have already adopted a "common carrier" exception to the principles of *respondeat superior*. The only issue before us is whether to extend it to the circumstances in this case.

In language relevant to the issue before us, the Indiana Supreme Court concluded:

> An examination of the relevant relationship here against the template of the common carrier exception and the rationales underlying it reveals that Heritage clearly assumed a non-delegable duty to be responsible for the care and safety of David Stropes. When Heritage accepted David as a result of its facility, it was fully cognizant of the disabilities and infirmities he suffered which rendered him unable to care for himself and which, in fact, undoubtedly formed the basis of their relationship. Their "contract of passage" contemplated that the entire responsibility for David's comfort, safety and maintenance would be on Heritage and that the performance of these tasks would be delegated to its employees.

24

> Given the degree of David's lack of autonomy and his dependence on Heritage for care and the degree of Heritage's control over David and the circumstances in which he found himself, we find that Heritage assumed a non-delegable duty to provide protection and care so as to fall within the common carrier exception. The standard of care which Heritage owed to David, therefore, was that actual care be used by Heritage and its employees to provide that protection. The trial court was in error to summarily reject his claim that such a duty existed.

*Stropes*, 547 N.E.2d at 253-54.

I would likewise conclude that given the degree of Greta's dependence on the State of Montana for her care and the degree of control that is exercised over her, MDC assumed a nondelegable duty to provide for her protection and care and that it violated that duty when she was raped and sexually abused while in the State's custody and care.

Contrary to the concerns expressed by the majority, such a holding would be totally consistent with the directives that have been enacted by the legislature. Section 53-20-101(1), MCA, which sets forth the purpose of Montana's chapter pertaining to the developmentally disabled, states that:

> The purpose of this part is to:
>
> (1) secure for each person who may be developmentally disabled such treatment and habilitation as will be suited to the needs of the person and to assure that such treatment and habilitation are skillfully and humanely administered with <u>full respect for the person's dignity and personal integrity</u> . . . . [Emphasis added.]

Section 53-20-142, MCA, in that same chapter, provides that:

Persons admitted to a residential facility for a period of habilitation shall enjoy the following rights:

(1) Residents have a right to dignity, privacy, and humane care.

. . . .

(8) Each resident has a right to a humane physical environment within the residential facility.

. . . .

(10) Corporal punishment is not permitted.

Section 53-20-163, MCA, provides in relevant part as follows:

(1) Every residential facility shall prohibit mistreatment, neglect, or abuse in any form of any resident.

In their concern for deference to the legislature, the majority have actually defeated the express intentions of the legislature. These statutory obligations are meaningless if the State of Montana and MDC can avoid liability for breaching the duties these statutes impose by simply contending that the duty was breached by one of the State's employees. The State has no way of acting other than through its employees.

The majority's rationale is that protection of people like Greta Glover is not our responsibility--it is up to the legislature.

It is true that where the legislature has preempted the common law, this Court should defer to that branch of government. However, it is equally clear that where the legislature has not acted to regulate the affairs of people, this Court has an

26

obligation to do so through the common law. This obligation is made clear by both our previous decisions and legislative statute. *See Haker v. Southwestern Railway Co.* (1978), 176 Mont. 364, 578 P.2d 724, and § 1-1-108, MCA.

The majority's expressed concern about acting in an area that should be reserved for the legislature is indeed a shallow basis for this result. It has shown no similar reluctance in the past under much less compelling circumstances.

The common law of this State is replete with examples of this Court's willingness to act where a vacuum exists in an important area of public policy that involves the rights of the litigants who appear before us. This Court adopted the law of strict liability without waiting for the legislature to do so in *Brandenburger v. Toyota* (1973), 162 Mont. 506, 513 P.2d 268. It allowed damages for loss of consortium by minors in *Pence v. Fox* (1991), 248 Mont. 521, 813 P.2d 429. This Court rewrote the law regarding bad faith in commercial transactions without waiting for the legislature to do so in *Story v. City of Bozeman* (1990), 243 Mont. 436, 791 P.2d 767. In fact, this Court originally adopted the very exception to *respondeat superior* that forms the basis of this decision without waiting for the legislature to do so. *Kornec v. Mike Horse Mining Co.* (1947), 120 Mont. 1, 180 P.2d 252. Why is the majority willing to adopt by common law part of the rule on *respondeat superior* which is set forth in

27

Restatement (Second) of Agency § 219 (1958), but unwilling to adopt the rest of that same rule by the same process?

This Court was willing to adopt a rule of nondelegable duty for owners of elevators, and presumably other common carriers, such as buses, trains, and ski lifts. *Cash v. Otis Elevator Co.* (1984), 210 Mont. 319, 684 P.2d 1041. Why is it any significant departure from what was done in *Cash* to extend the same protection to an autistic, retarded woman incapable of protecting herself or communicating with others when she has been sexually abused by the employees of the very institution in which she was placed for her protection and care?

I agree with Justice Benjamin Cardozo, who stated in his treatise, Law and Literature (1931), "[t]he common law, unless bound and riveted by statute, has instruments at hand of many varieties and shapes for molding of that justice which is the end of her endeavor."

This Court is willing to use the common law selectively where it suits the majority's notions of sound public policy. However, it has abdicated that important responsibility in this case.

The primary reason for which an independent branch of government, such as the judiciary, exists is to protect the rights of private individuals from governmental abuse. There can be no clearer example of governmental abuse than when one of its agents sexually abuses and rapes a retarded woman who had been placed in the government's care and entrusted to the government for her

protection. I, therefore, dissent from the majority's decision to reverse the District Court's determination of the defendant's liability.

I also dissent from that part of the majority opinion which holds that Margaret Maguire was not a direct victim of Dean Drummond's tortious conduct, and therefore, cannot recover damages for the emotional distress she has experienced.

Margaret Maguire is Greta Glover's mother and legal guardian. She cared for her daughter until Greta was 12 years of age, when she was no longer able to do so. After her daughter was admitted to state institutions, Margaret visited her frequently and took her home on weekends.

On November 16, 1988, she was advised that her daughter was pregnant. Her daughter was incapable of deciding what to do about the pregnancy. Therefore, Margaret had to make those decisions for her. Margaret literally substituted herself for Greta in terms of all the difficult decisions that are attendant to an unwanted pregnancy. She was concerned about Greta's health and was concerned about whether Greta could deliver a healthy baby. Yet, because of her religious beliefs, she could not choose an abortion. In the process of making these decisions, her health deteriorated and she required both psychological and medical treatment.

After the baby was born on April 4, 1989, she had to make the decision to place the baby for adoption, just as if it was her own child. Following the decision to have the baby adopted, she was

29

hospitalized for depression with symptoms of starvation and thoughts of suicide. Her doctors related these severe health problems to the decisions she was forced to make about Greta's pregnancy and the adoption of the baby.

If any person with the intellectual capacity to make her own decisions was raped and suffered physically and mentally, as Margaret Maguire did because of the decisions that had to be made following that rape, there is no question that that person would be entitled to compensation for those emotional and physical injuries. Margaret Maguire was no less a direct victim of Dean Drummond's conduct than Greta Glover.

In *Johnson v. Supersave Markets, Inc.* (1984), 211 Mont. 465, 686 P.2d 209, we held that:

> This Court adopts the species of case approach which requires a factual analysis of each case to determine whether the alleged "emotional distress" merits compensation. In determining whether the distress is compensable absent a showing of physical or mental injury, we will look to whether tortious conduct results in a *substantial* invasion of a legally protected interest and causes a *significant* impact upon the person of the plaintiff.

*Johnson*, 686 P.2d at 213.

The instruction given to the jury regarding Margaret Maguire's right to recover damages for her own emotional distress was completely consistent with our directive in *Johnson*. The jury was instructed as follows:

> If you find that the State of Montana was responsible in causing Margaret Maguire emotional

30

distress, the plaintiff, Margaret Maguire, may be entitled to recover damages. You are instructed that Margaret Maguire had a right to be free from the emotional distress caused by being obligated to make decisions regarding the pregnancy of her daughter and ward, Greta Glover. Before damages for emotional distress may be awarded, you must find that the defendant, State of Montana, substantially invaded that right and that this invasion caused a significant impact upon the plaintiff, Margaret Maguire, and resulted in severe emotional distress.

The majority cites to *Marlene F. v. Psychiatric Med. Clinic* (Cal. 1989), 770 P.2d 278, and *Molien v. Kaiser Foundation Hospitals* (Cal. 1980), 616 P.2d 813. In both of these cases, plaintiffs were entitled to claim damages for emotional distress, even though they were not the direct victim of the negligent conduct which gave rise to their claims. The basis for recovery in both cases was that they were owed a duty of care by the tort-feasor. The majority concludes that the existence of that duty "depends upon the foreseeability that severe emotional distress will result from the breach of that duty." Certainly, on that basis, the State of Montana owed a duty to Margaret Maguire in this case. Not only did she entrust her daughter to them with the understanding that they would provide for her care and security, but it was obvious to the employees of MDC that it was Margaret Maguire who necessarily made every decision that affected Greta Glover's personal life. How could it not be foreseeable that if Greta Glover was raped and impregnated, that Margaret Maguire would be left with all of the decisions made necessary because of that pregnancy?

31

The majority decision is disturbing on several levels. First, and most importantly, it unnecessarily deprives the plaintiffs, who have suffered so much from such brutal treatment by the agents of the State, from the necessary compensation with which they could begin putting their lives back together. Second, it sets a terrible precedent which will be applied to bar future victims of intentional abuse by State employees from reasonable compensation, no matter how serious and devastating their loss. Finally, this Court's decision regarding Margaret Maguire's damages, creates the fiction that Margaret Maguire was not a direct victim of Dean Drummond's brutal conduct. This decision ignores the reality of this lady's unique situation and this family's terrible suffering.

For these reasons, I dissent from Parts I, III, and IV of the majority decision. I would affirm the judgment of the District Court.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent of Justice Trieweiler.

_____
Justice

32

August 12, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Sam E. Haddon
Boone, Karlberg & Haddon
P.O. Box 9199
Missoula, MT  59807-9199

*(faxed + mailed)*

G. Curtis Drake
KELLER, REYNOLDS, DRAKE, STERHAGEN & JOHNSON
38 South Last Chance Gulch
Helena, MT  59601

*(hand delivered)*

William P. Joyce
BURGESS, JOYCE & WHALEN
2801 South Montana St.
Butte, MT  59701

*(faxed + mailed)*

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy